UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(ALEXANDRIA DIVISION)

| | |
|---|---|
| JACOB A. SCHUR,<br><br>*Plaintiff,*<br><br>v.<br><br>LEILA H. ZACKRISON, M.D.,<br><br>and<br><br>LEILA H. ZACKRISON, M.D., P.C.,<br><br>*Defendants.* | Case No.: 1 15 CV 1013<br><br> |

## COMPLAINT

COMES NOW Jacob A. Schur (the "Plaintiff"), by counsel, and submits this Complaint and moves this Court for judgment against Leila H. Zackrison, M.D., and Leila H. Zackrison, M.D., P.C. (the "Defendants"), and in support of which states as follows:

### PARTIES

1. Plaintiff Jacob A. Schur is a citizen of the State of Colorado.

2. Defendant Leila H. Zackrison, M.D., is a physician licensed to practice medicine in the Commonwealth of Virginia. Dr. Zackrison is a citizen of the Commonwealth of Virginia.

3. Defendant Leila H. Zackrison, M.D., P.C. (the "Practice"), is a Virginia professional corporation that maintains its principal office at 3920 Pender Drive, Suite 260, Fairfax, Virginia 22030.

4. The Practice transacts business under fictitious names, including Optimal Health Dimensions.

1

5. At all relevant times, Dr. Zackrison owned, operated, and/or managed the Practice.

6. At all relevant times, Dr. Zackrison was an agent, employee, and/or servant of the Practice and was acting within the course and scope of her agency, employment, and/or servanthood.

7. At all relevant times, Dr. Zackrison and the Practice had other staff members, including registered nurses and nurse practitioners, that were their agents, employees, and/or servants that were acting within the course and scope of their agency, employment, and/or servanthood.

8. The Practice is vicariously liable for the acts committed by Dr. Zackrison.

9. Dr. Zackrison and the Practice are vicariously liable for the acts committed by their staff members.

## JURISDICTION AND VENUE

10. The preceding Paragraphs 1 through 9 are incorporated as if set forth fully herein.

11. The Court maintains jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states and the amount in controversy exceeds seventy-five thousand dollars exclusive of interests of costs.

12. Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to this case occurred in this judicial district.

## FACTS

13. The preceding Paragraphs 1 through 12 are incorporated as if set forth fully herein.

14. In May 2012, Mr. Schur was bitten by two ticks.

15. Mr. Schur was concerned about contracting Lyme disease from the ticks, so he contacted Dr. Zackrison, whom he understood was an expert in Lyme disease, and scheduled an appointment for June 7, 2012.

16. On June 7, 2012, Mr. Schur was seen by Christine Jansen, a nurse practitioner at the Practice, and was told that Dr. Zackrison would not see him until he had multiple visits with the Practice's staff members and that the Practice did not accept health insurance.

17. After examining Mr. Schur, Nurse Jansen ordered Doxycycline and laboratory tests.

18. The laboratory tests were performed by Quest Diagnostics and Medical Diagnostic Laboratories.

19. On June 26, 2012, Mr. Schur again saw Nurse Jansen and was told that the ticks that bit him were Lone Star ticks.

20. Nurse Jansen diagnosed a polymicrobial state that included mycoplasma pneumonia, chlamydophila pneumonia, and legionella.

21. Nurse Jansen continued the Doxycycline and ordered injections of methylcobalamin. Nurse Jansen also ordered additional laboratory tests.

22. On June 27, 2012, Quest Diagnostics reported that Mr. Schur was negative for Lyme disease.

23. On June 29, 2012, Medical Diagnostic Laboratories reported that Mr. Schur was negative for Lyme disease, Bartonella, and Babesia.

24. The results of the laboratory tests performed by Quest Diagnostics and Medical Diagnostic Laboratories were sent to the Practice.

25. Mr. Schur continued to treat with the Practice; according to his medical records, he suffered from "gut inflammation" and a polymicrobial state that included legionella and naplasmosis.

26. Nurse Jansen and other staff members of the Practice told Mr. Schur that he was very ill, suffered from multiple conditions, and needed extensive treatment to help make him better.

27. When Mr. Schur asked how much treatment he would need and the cost for such treatment, he was asked how much money he had available and told that the Practice would tailor his treatment around his budget.

28. Mr. Schur was also told that Dr. Zackrison would be "very upset" if he did not schedule treatment visits every two weeks.

29. Nurse Jansen's treatment included: laboratory tests, including additional tests for Lyme disease; extensive prescriptions for antibiotics; nutraceuticals, including vitamins; continued prescriptions for Doxycycline; and orders to follow a specific diet.

30. Mr. Schur had to inject himself with the nutraceuticals.

31. Nurse Jansen told Mr. Schur that he could have a stroke, develop shingles, or develop other ailments if he did not follow the Practice's treatment regimen.

32. The Practice's staff members told Mr. Schur that as long as he was on antibiotics, he would need to schedule frequent appointments with the Practice so its staff members and Dr. Zackrison could monitor his progress.

33. The Practice sold the nutraceuticals that Dr. Zackrison and the Practice staff members prescribed, as well as additional items, in a store that is attached to the Practice.

34. Mr. Schur was concerned about his health because of the statements made by the Practice's staff members, and as a consequence, he experienced severe anxiety and stress over his health.

35. Mr. Schur followed the treatment plan ordered by the Practice, including purchasing and taking the antibiotics and nutraceuticals from the Practice.

36. On October 4, 2012, Medical Diagnostic Laboratories reported that additional laboratory test ordered by the Practice were negative for Lyme disease.

37. The results of the laboratory test performed by Medical Diagnostic Laboratories were communicated to the Practice.

38. Although Mr. Schur's care was under the supervision of Dr. Zackrison and the Practice, Mr. Schur saw Dr. Zackrison for the first time on October 11, 2012.

39. Despite the repeated negative laboratory tests, Dr. Zackrison diagnosed Mr. Schur with Lyme disease.

40. Dr. Zackrison diagnosed additional infections as part of Mr. Schur's alleged "polymicrobial state," including: anaplasmosis, babesiosis, mycoplasmosis/legionella, "viral overload," encephalopathy/encephalitis, chronic neuritis, and hypercalcphia.

41. On Mr. Schur's medical records, Dr. Zackrison stated that Mr. Schur suffered from "Lyme," "anaplasmosis," "babesiosis," "bartowllosis," "mcoplasmosis/legoionellosis," "encephalopathy/encephalitis," "chronic neuritis," and "hypercalcphia."

42. Dr. Zackrison told Mr. Schur that he was very ill and required extensive treatment.

43. Dr. Zackrison recommended additional antibiotics, additional nutraceuticals, additional tests, and intravenous nutrients.

44. Mr. Schur was concerned about receiving treatment intravenously, so he sought a second opinion.

45. Mr. Schur contacted Paul G. Auwaerter, M.D., the Clinical Director of the Division of Infectious Diseases at Johns Hopkins Department of Medicine and a recognized expert in tick-born diseases.

46. After reviewing Mr. Schur's medical records, including the laboratory tests ordered by the Practice, and examining Mr. Schur, Dr. Auwaerter told Mr. Schur that he never had Lyme disease or any other condition that required treatment.

47. Dr. Auwaerter told Mr. Schur that Lone Star ticks, the type of tick that bit him, cannot carry Lyme disease.

48. Dr. Auwaerter told Mr. Schur that the laboratory tests ordered and reviewed by the Practice were negative for Lyme disease.

49. Dr. Auwaerter told Mr. Schur that the treatment ordered by Dr. Zackrison and the Practice was not medically necessary.

50. Dr. Zackrison and the Practice's staff members made misrepresentations about Mr. Schur's health, including that he suffered from Lyme disease and other serious medical conditions that required medical care and treatment.

51. Dr. Zackrison and the Practice's staff members made these misrepresentations to convince Mr. Schur to undergo treatment, undergo repeated testing, and purchase medications and other remedies that were not medically necessary.

52. As a result of these misrepresentations, Mr. Schur continued to treat with Dr. Zackrison and the Practice when no treatment was medically necessary.

53. The charges for the treatment ordered by Dr. Zackrison and the Practice were approximately twenty-five thousand dollars for treatment of conditions he did not have and treatment that was not medically necessary or reasonable.

54. As a result of these misrepresentations, Mr. Schur sustained damages.

55. On August 30, 2013, the Virginia Board of Medicine issued a reprimand to Dr. Zackrison for diagnosing and treating a patient with conditions that were not medically supported or medically necessary.

56. Dr. Zackrison, both individually and through the Practice, diagnosed Mr. Schur with conditions that he did not have in order to persuade him to embark on a continuous and expensive treatment regimen, including the purchase of Dr. Zackrison and the Practice's products and services.

## COUNT I—NEGLIGENCE

57. The preceding Paragraphs 1 through 56 are incorporated as if set forth fully herein.

58. Dr. Zackrison and the Practice's staff members were negligent in, among other things:

    (a) diagnosing Plaintiff with conditions he did not have;

    (b) treating Plaintiff for conditions he did not have; and

    (c) coercing Plaintiff to accept treatment for conditions that he did not have.

59. The Practice is vicariously liable for the negligence committed by Dr. Zackrison and the Practice's staff members, including but not limited to Nurse Jansen.

60. Dr. Zackrison is vicariously liable for the negligence committed by the Practice's staff members, including but not limited to Nurse Jansen.

61. As a direct and proximate result of Defendants' negligence, Plaintiff sustained injuries and damages cognizable at law, including but not limited to the following: bodily injury; physical pain and mental anguish suffered in the past; inconvenience suffered in the past; and medical expenses incurred in the past.

## COUNT II—ACTUAL FRAUD

62. The preceding Paragraphs 1 through 56 are incorporated as if set forth fully herein.

63. Dr. Zackrison and the Practice's staff members made intentional or knowing misrepresentations of material fact, with the intent to mislead Plaintiff, which Plaintiff relied upon.

64. The Practice is vicariously liable for the fraud committed by Dr. Zackrison and the Practice's staff members, including but not limited to Nurse Jansen.

65. Dr. Zackrison is vicariously liable for the fraud committed by the Practice's staff members, including but not limited to Nurse Jansen.

66. Defendants' actions amounted to a willful and wanton disregard of Plaintiff's rights.

67. As a result of Defendants' fraud, Plaintiff sustained damages.

## COUNT III—CONSTRUCTIVE FRAUD

68. The preceding Paragraphs 1 through 56 are incorporated as if set forth fully herein.

69. Dr. Zackrison and the Practice's staff members made negligent misrepresentations of material fact, with the intent to mislead Plaintiff, which Plaintiff relied upon.

70.     The Practice is vicariously liable for the fraud committed by Dr. Zackrison and the Practice's staff members.

71.     Dr. Zackrison is vicariously liable for the fraud committed by the Practice's staff members.

72.     Defendants' actions amounted to a willful and wanton disregard of Plaintiff's rights.

73.     As a result of Defendants' fraud, Plaintiff sustained damages.

**COUNT IV—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

74.     The preceding Paragraphs 1 through 56 are incorporated as if set forth fully herein.

75.     Dr. Zackrison and the Practice's staff members had the specific purpose of inflicting emotional distress upon Plaintiff or intended the specific conduct and knew, or should have known, that the conduct would likely result in emotional distress.

76.     Defendants' conduct was outrageous and intolerable in that it offended against generally acceptable standards of decency and morality.

77.     The Practice is vicariously liable for the intentional infliction of emotional distress committed by Dr. Zackrison and the Practice's staff members, including but not limited to Nurse Jansen.

78.     Dr. Zackrison is vicariously liable for the intentional infliction of emotional distress committed by the Practice's staff members, including but not limited to Nurse Jansen.

79.     Defendants' actions amounted to a willful and wanton disregard of Plaintiff's rights.

80.     Plaintiff suffered severe emotional distress.

81. Plaintiff's severe emotional distress was proximately caused by Defendants' conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jacob A. Schur moves this Court for judgment against Defendants Leila H. Zackrison, M.D., and Leila H. Zackrison, M.D., P.C., in an amount of compensatory and punitive damages consistent with the evidence, with prejudgment interest from the date of incident forward, costs incurred, and any other relief this Court deems just.

Respectfully submitted,

JACOB A. SCHUR

By Counsel

SICKELS, FREI & MIMS, P.C.

/s/ *[signature]*

Gary B. Mims, Esq. (VSB No. 19184)
Matthew C. Perushek, Esq. (VSB No. 84308)
3925 Chain Bridge Road, Suite 402
Fairfax, Virginia 22030
Telephone: (703) 925-0500
Facsimile: (703) 925-0501
gary.mims@sfmlawyers.com
matthew.perushek@sfmlawyers.com
*Counsel for Plaintiff*